**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

JACK MEYERS, *on behalf of himself and all others similarly situated*,

Plaintiff,

v.

ZEROED-IN TECHNOLOGIES, LLC,

Serve: Registered Agent
Keith A. Goode
780 Elkridge Landing Road,
Suite 208
Linthicum, MD 21090

and

DOLLAR TREE, INC.

Serve: Corporation Service Company
100 Shockoe Slip, Floor 2
Richmond, VA 23219

and

FAMILY DOLLAR, LLC

Serve: Corporation Service Company
2626 Glenwood Avenue, Suite 550
Raleigh, NC 27608

Defendants.

**Case No. ______________**

**JURY DEMAND**

## CONSUMER CLASS ACTION COMPLAINT

Plaintiff JACK MEYERS ("Plaintiff") brings this Class Action Complaint against ZEROED-IN TECHNOLOGIES, LLC ("Zeroed-In"), DOLLAR TREE, INC., and FAMILY DOLLAR, LLC (Dollar Tree, Inc. and Family Dollar, LLC are collectively referred to as "Dollar Tree") (Zeroed-In Technologies, LLC, Dollar Tree, Inc., and Family Dollar, LLC are collectively referred to as "Defendants"), on behalf of themselves and all others similarly situated ("Class Members"), and allege, upon personal knowledge as to his own actions and his counsel's investigations, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this class action against Defendants for their failure to properly secure and safeguard personally identifiable information ("PII")[1] including, but not limited to full names, dates of birth, and Social Security Numbers, for customers and employees of Dollar Tree that utilized the services of Zeroed-In.

2. According to Zeroed-In's website, it offers workforce analytics and data management software to over 70 clients and has over 30,000 registered users.[2]

3. To provide these services, and in the ordinary course of Defendant Zeroed-In's business, it acquires, possesses, analyzes, and otherwise utilizes Plaintiff's and putative Class Members' PII.

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on its face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security numbers, passport numbers, driver's license numbers, financial account numbers).

[2] https://www.zeroedin.com/how-it-works/ (last visited Dec. 5, 2023).

4. According to Dollar Tree's most recent SEC Quarterly Report, it operates more than 16,600 retail discount stores across the United States and Canada under two reporting segments, Dollar Tree and Family Dollar.[3]

5. Defendant Dollar Tree trades under the symbol DLTR on the Nasdaq stock exchange and had revenue of $28.332 billion in 2023.

6. Defendant Dollar Tree acquired Defendant Family Dollar for approximately $9.2 billion in 2015 and the companies merged.[4]

7. All Defendants are sophisticated corporations and regularly maintain PII which they know to be sensitive. Moreover, Defendants are aware of the consequences that would result to consumers and employees if the information they maintain were to be compromised and their corresponding obligation to protect against such compromise.

8. In its Privacy Notice in effect at the time of the Data Breach, Zeroed-In represents, "We employ robust security measures to protect against the loss, misuse and alternation of the personal information under our control. The Sites employ Secure Socket Layer (SSL) technology using both server authentication and data encryption. The Sites are hosted in a secure server environment that uses firewalls, intrusion detection systems, and other advanced technology to protect against interference or access from outside intruders."[5]

9. In its Privacy Policy, Dollar Tree represents that it uses "various reasonable and appropriate safeguards (administrative, organizational, technical electronic, procedural, and physical) to protect the Personal Information we collect and process. Our security controls are

---

[3] https://corporate.dollartree.com/investors/sec-filings/content/0000935703-23-000063/dltr-20231028.htm (last visited Dec. 5, 2023).

[4] https://corporate.dollartree.com/news-media/press-releases/detail/120/dollar-tree-completes-acquisition-of-family-dollar (last visited Dec. 5, 2023).

[5] Zeroed-In Privacy Policy, https://www.zeroedin.com/privacy-policy/ (last visited Dec. 5, 2023).

designed to maintain an appropriate level of confidentiality, integrity, and availability of your Personal Information."[6]

10. Prior to and through August 7, 2023, Dollar Tree, and in furtherance of its operations, obtained the PII of Plaintiff and Class Members, its employees and consumers, and shared that PII, unencrypted, with Zeroed-In, which stored that PII, unencrypted, in an Internet-accessible environment on Zeroed-In's network.

11. With this action, Plaintiff seeks to hold Defendants responsible for the harms it caused and will continue to cause Plaintiff and at least 1,977,486 other similarly situated persons[7] in the massive and preventable cyberattack purportedly discovered by Defendant Zeroed-In on August 8, 2023, by which cybercriminals infiltrated Defendant Zeroed-In's inadequately protected network servers and accessed and exfiltrated highly sensitive PII belonging to Plaintiff and Class Members which was being kept unprotected (the "Data Breach").

12. Plaintiff further seeks to hold Defendants responsible for not ensuring that Defendants maintained the PII in a manner consistent with industry standards.

13. Upon information and belief, Defendant Zeroed-In was targeted in the cyberattack due to the high volume of sensitive PII that it collected and maintained on its computer networks and/or systems and the high value of that information to cyber criminals in facilitating identity theft and fraud.

14. On or about November 27, 2023, Defendant Zeroed-In notified state Attorneys

---

[6] Dollar Tree Privacy Policy, https://www.dollartree.com/privacy-policy (last visited Dec. 5, 2023).

[7] Data Breach Notifications, Office of the Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/b3993ddd-2443-4645-ae45-f36dc7686236.shtml (last visited Dec. 5, 2023).

General and many Class Members about the widespread Data Breach (the "Notice Letter").[8]

15. While Defendant claims to have discovered the Data Breach as early as August 8, 2023, Defendant did not begin informing victims of the Data Breach until November 27, 2023, 111 days later. Indeed, Plaintiff and Class Members were wholly unaware of the Data Breach until they received Notice Letters from Defendants. During this time, Plaintiff and Class Members were unaware that their sensitive PII had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm.

16. The Notice Letter provides no further information regarding the Data Breach and only recommends how victims can place a fraud alert or credit freeze on their account and how to sign up for the limited identity monitoring services Defendant offered in response to the Data Breach. The Notice Letter does not explain how the Data Breach occurred, what steps Defendant took following the Data Breach, whether Defendant made any changes to its data security, or most importantly, whether Plaintiff's and Class Members' PII remains in the possession of criminals.

17. By acquiring, utilizing, and benefiting from Plaintiff's and Class Members' PII for its business purposes, Defendants owed or otherwise assumed common law, contractual, and statutory duties that extended to Plaintiff and Class Members. These duties required Defendants to design and implement adequate data security systems to protect Plaintiff's and Class Members' PII in its possession and to keep Plaintiff's and Class Members' PII confidential, safe, secure, and protected from unauthorized disclosure, access, dissemination, or theft.

18. Defendants breached these duties by failing to implement adequate data security measures and protocols to properly safeguard and protect Plaintiff's and Class Members' PII from

---

[8] Sample Notice Letter available at the Office of the Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/b3993ddd-2443-4645-ae45-f36dc7686236.shtml (last visited Dec. 3, 2023).

a foreseeable cyberattack on its systems that resulted in the unauthorized access and theft of Plaintiff's and Class Members' PII.

19. Currently, the full extent of the types of PII, the scope of the breach, and the root cause of the Data Breach are all within the exclusive control of Defendants, its agents, counsel, and forensic security vendors at this phase of the litigation.

20. Defendants disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, and/or negligently failing to take and implement adequate and reasonable measures to ensure that the PII of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the Plaintiff's and Class Members' PII was compromised through disclosure to an unknown and unauthorized criminal third party.

21. Upon information and belief, Defendants breached its duties and obligations in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiff and Class Members of Defendants' inadequate data security practices; (6) failing to encrypt or adequately encrypt the PII; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack; and (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

22. Based on the type of sophisticated and targeted criminal activity, the type of PII involved, and Defendants' admission that the PII was accessed, it can be concluded that the unauthorized criminal third party was able to successfully target Plaintiff's and Class Members' PII, infiltrate and gain access to Defendant Zeroed-In's network, and exfiltrate Plaintiff's and Class Members' PII, including unencrypted names, dates of birth, and Social Security Numbers, for the purposes of utilizing or selling the PII for use in future fraud and identity theft related cases.

23. As a result of Defendants' failures and the Data Breach, Plaintiff's and Class Members' identities are now at a current and substantial imminent and ongoing risk of identity theft and shall remain at risk for the rest of their lives.

24. As Defendants instructed, advised, and warned in its Notice Letter discussed below, Plaintiff and Class Members must now closely monitor their financial accounts to guard against future identity theft and fraud. Plaintiff and Class Members have heeded such warnings to mitigate against the imminent risk of future identity theft and financial loss. Such mitigation efforts included and will include into the future: (a) reviewing financial statements; (b) changing passwords; and (c) signing up for credit and identity theft monitoring services. The loss of time and other mitigation costs are tied directly to guarding against and mitigating against the imminent risk of identity theft.

25. Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendants' failures to: (i) adequately protect the PII of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendants' inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendants' conduct amounts to negligence and violates federal and state statutes.

26. Plaintiff and Class Members have suffered injury as a result of Defendants' conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) the disclosure of their private information; (v) failure to receive the benefit of their bargains with Defendants; (vi) nominal damages; (vii) the continued and certainly increased risk to their PII, and damages in an amount equal to the cost of securing identity theft products to assisting in monitoring and protecting them from identity theft, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

27. Defendants disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that the PII of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

28. Plaintiff brings this action on behalf of all persons whose PII was compromised due to Defendants' failure to adequately protect Plaintiff's and Class Members' PII. Accordingly,

Plaintiff brings this action against Defendants seeking redress for their unlawful conduct and asserts claims on behalf of the Class for Negligence, Breach of Implied Contract, and Unjust Enrichment.

## PARTIES

29. Plaintiff Jack Meyers is an adult individual and, at all relevant times herein, a resident and citizen of the state of California, residing in West Sacramento, California, Yolo County.

30. Defendant Zeroed-In Technologies, LLC is a Florida registered limited liability corporation with its principal place of business located at 780 Elkridge Landing Road, Suite 208, Linthicum, Maryland. Upon information and belief, members of Zeroed-In Technologies include Keith A. Goode[9] and Chris Moore. Respectively, upon investigation of counsel, Keith Goode is domiciled in the state of Maryland, where public records indicate he resides and intends to stay.

31. Defendant Dollar Tree, Inc. is incorporated in Virginia with its principal place of business located at 500 Volvo Parkway, Chesapeake, Virginia 23320.

32. Defendant Family Dollar, LLC was formed in North Carolina and has its principal place of business at 500 Volvo Parkway, Chesapeake, Virginia 23320.

## JURISDICTION AND VENUE

33. This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member, including Plaintiff, is a citizen of a state different

[9] Keith A. Goode is listed as Vice President of Client Services on the Zeroed-In website. Keith Goode is also listed as the Maryland resident agent for Zeroed-In Technologies, LLC on its website.

from Zeroed-In to establish minimal diversity.

34. Zeroed-In is a citizen of Maryland because its principal place of business is in is in Linthicum, Maryland and one or more of its members reside in Maryland. Thus, the Federal District of Maryland has general jurisdiction over Zeroed-In.

35. The Federal District of Maryland has personal jurisdiction over Zeroed-In because it conducts substantial business in Maryland and this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

36. This Court has general personal jurisdiction over Defendants Dollar Tree, Inc. and Family Dollar, LLC because they shared Plaintiff's and Class Members' PII with Zeroed-In in Maryland and this District.

37. Venue is proper in this District under 28 U.S.C. §1391(b) because Zeroed-In operates in this District, Dollar Tree, Inc. and Family Dollar, LLC provided and entrusted Plaintiff's and Class Members' PII to Zeroed-In in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

***Background***

38. Plaintiff and Class Members, who are past and current employees or clients of Dollar Tree, provided and entrusted Dollar Tree and the others with sensitive and confidential information, including but not limited to their names, dates of birth, and Social Security numbers.

39. Zeroed-In is a provider of human resource analytics software and solutions. Zeroed-In contracts with companies like Dollar Tree and uses the PII of their consumers and employees to provide its services. Upon information and belief, Zeroed-In's contracts with the entities that provided the PII of Plaintiff and Class Members contained specific obligations to

safeguard the PII it collected and maintained as part of its business practices.

40. As a condition of being a past or current employee or customer of Dollar Tree, Dollar Tree required that Plaintiff and Class Members entrust Dollar Tree with highly confidential PII.

41. Dollar Tree and others shared the PII of Plaintiff and Class Members with Zeroed-In, which stored the PII unencrypted and on its Internet-accessible network.

42. Plaintiff and Class Members relied on the companies that entrusted their PII to Zeroed-In, and on Zeroed-In itself, to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the integrity and confidentiality of their PII and demand security to safeguard their PII.

43. In addition to Plaintiff's and Class Members' complete dependence on Dollar Tree and Zeroed-In to protect their PII, because this was a readily foreseeable and preventable data breach, and Defendants represented that they valued and would protect the PII of Plaintiff and Class Members, Defendants had duties to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties.

***The Cyberattack and Data Breach***

44. On or about November 27, 2023, Zeroed-In sent Plaintiff and Class Members the Notice Letter, titled *Notice of Security Incident,*[10] in which Zeroed-In informed Plaintiff and other Class Members that:

**What happened?**

[10] Sample Notice Letter available at the Office of the Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/b3993ddd-2443-4645-ae45-f36dc7686236.shtml (last visited Dec. 5, 2023).

> On August 8, 2023, Zeroed-In discovered suspicious activity related to certain systems. Zeroed-In immediately took steps to secure the systems and launched an investigation into the nature and scope of the activity. Through the investigation, we determined that an unauthorized actor gained access to certain systems between August 7, 2023, and August 8, 2023. While the investigation was able to determine that these systems were accessed, it was not able to confirm all the specific files that were accessed or taken by the unauthorized actor. Therefore, Zeroed-In conducted a review of the contents of the systems to determine what information was present at the time of the incident and to whom the information relates.
>
> **What information was involved?**
>
> This review was completed on August 31, 2023, and Zeroed-In notified Dollar Tree & Family Dollar of this incident. We are notifying you because the investigation determined that your information was present on the systems involved at the time of the incident and the information includes your name, date of birth, and Social Security number.
>
> **What are we doing?**
>
> Zeroed-In takes the confidentiality, privacy, and security of information in our care very seriously. Upon discovering the event, we took steps to secure our systems, launched an investigation, and reported this event to federal law enforcement. As part of our ongoing commitment to the security of your information, we are reviewing our existing policies and procedures and implemented additional safeguards to prevent a similar event from occurring in the future. Zeroed-In is also reporting this event to relevant regulators, as required.
>
> OSC is investigating this incident with the assistance of third-party cybersecurity experts. They have deployed enhanced security monitoring tools across their network and notified the Federal Bureau of Investigation (FBI) of this incident.[11]

45. On or about November 27, 2023, Zeroed-In notified various state Attorneys General of the Data Breach, including the Attorneys General of Texas and Maine, and provided them "sample" notices of the Data Breach. Zeroed-In notified the Attorney General of Texas that 202,482 Texas residents were affected by the Data Breach and notified the Attorney General of Maine that 7,034 Maine residents were affected by the Data Breach. In total, at least 1,977,486

---

[11] *Id.*

individuals' data was compromised by the Data Breach.[12]

46. Zeroed-In admitted in the Notice Letter, the letters to the Attorneys General, and the "sample" notices of the Data Breach, that an unauthorized actor accessed and obtained sensitive information about Plaintiff and Class Members, including their names, dates of birth, and Social Security Numbers. Upon information and belief, this PII was accessible, unencrypted, unprotected, and vulnerable to acquisition and/or exfiltration by the unauthorized actor.

47. In response to the Data Breach, Zeroed-In claims that it has "deployed enhanced security monitoring tools across their network..."[13] However, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure a breach does not occur again have not been shared with regulators or Plaintiff and Class Members, who retain a vested interest in ensuring that their information remains protected.

48. As a result of the Data Breach, the unencrypted PII of Plaintiff and Class Members will end up for sale on the dark web or fall into the hands of companies that will use the detailed PII for targeted marketing without the consent of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

49. While Zeroed-In stated in the Notice Letter that the unusual activity occurred and

[12] See *Data Breach Notifications*, Office of the Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/b3993ddd-2443-4645-ae45-f36dc7686236.shtml (last visited Dec. 3, 2023).

[13] See Notice Letter.

was discovered between August 7, 2023 and August 8, 2023, Zeroed-In did not begin notifying victims until November 27, 2023, 111 days after Zeroed-In discovered that the Data Breach occurred.[14]

50. Zeroed-In waited over 111 days to disclose the Data Breach to Plaintiff and Class Members. During this time Plaintiff and Class Members had no idea their PII had been compromised in the Data Breach, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

51. Zeroed-In has offered abbreviated, non-automatic credit monitoring services to victims thereby identifying the harm posed to Plaintiff and Class Members as a result of the Data Breach, which does not adequately address the lifelong harm that victims face following the Data Breach. Indeed, the Data Breach involves PII that cannot be changed, such as Social Security numbers.

***The Data Breach Was Foreseeable***

52. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in many industries preceding the date of the breach.

53. Because Defendants had duties to protect Plaintiff's and Class Members' PII, Defendants should have accessed readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information.

54. In the years immediately preceding the Data Breach, Defendants knew or should have known that Zeroed-In's computer systems were a target for cybersecurity attacks, including

[14] *Id*.

attacks involving data theft, because warnings were readily available and accessible via the internet. In addition to articles in the public press about the extensive number of data breaches affecting companies throughout all industries, governmental agencies have constantly sent and published notices of the need for companies who maintain sensitive personal information to carefully safeguard the sensitive and valuable information collected from consumers.

55. In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[15]

56. Indeed, cyberattacks on business analytics companies like Zeroed-In have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, potential attack.[16]

57. This readily available and accessible information confirms that, prior to the Data Breach, Defendants knew or should have known that (i) unauthorized actors were targeting companies such as Zeroed-In, (ii) unauthorized actors were aggressive in their pursuit of companies such as OSC, (iii) unauthorized actors were leaking corporate information on dark web portals, and (iv) unauthorized actors' tactics included threatening to release stolen data.

58. Given Dollar Tree's knowledge that the sensitive information it maintained would be targeted by hackers, Dollar Tree had a duty to convey that information to Zeroed-in and to ensure that Zeroed-In instituted appropriate data security procedures to guard against this threat.

59. In light of the information readily available and accessible on the internet before the Data Breach, Dollar Tree, having elected to share the unencrypted PII of consumers with

---

[15] *See* 2021 Data Breach Annual Report, ITRC 6 (Jan. 2022), available at https://www.idtheftcenter.org/notified (last visited Dec. 5, 2023).

[16] FBI, Secret Service Warn of Targeted, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited Dec. 3, 2023).

Zeroed-In, and Zeroed-In, having elected to store that PII in an Internet-accessible environment, had reason to be on guard for the targeting and exfiltration of the PII at issue here. Defendants had cause to be particularly on guard against such an attack as a result of their foreknowledge as demonstrated in their public representations.

60. Prior to the Data Breach, Defendants knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack.

61. Prior to the Data Breach, Defendants knew or should have known that they should have encrypted the Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

***Defendants Had an Obligation to Protect the PII***

62. Defendants' failure to adequately secure Plaintiff's and Class Members' PII breaches duties it owes Plaintiff and Class Members under statutory and common law. Moreover, Plaintiff and Class Members surrendered their highly sensitive personal data to Defendants under the implied condition that Defendants would keep it private and secure. Accordingly, Defendants also have an implied duty to safeguard their data, independent of any statute.

63. Defendants were prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. S*ee, e.g.*, *FTC v. Wyndham Worldwide Corp*., 799 F.3d 236 (3d Cir. 2015).

64. In addition to its obligations under federal and state laws, Defendants owed a duty

to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in Defendants' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII of Plaintiff and Class Members.

65. Defendants owed a duty to Plaintiff and Class Members to design, maintain, and test its computer systems, servers, and networks to ensure that the PII in its possession was adequately secured and protected.

66. Defendants owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the PII in its possession, including not sharing information with other entities who maintained substandard data security systems.

67. Defendants owed a duty to Plaintiff and Class Members to implement processes that would immediately detect a breach on its data security systems in a timely manner.

68. Defendants owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

69. Defendants owed a duty to Plaintiff and Class Members to disclose if its computer systems and data security practices were inadequate to safeguard individuals' PII from theft because such an inadequacy would be a material fact in the decision to entrust this PII to Defendants.

70. Defendants owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

71. Defendants owed a duty to Plaintiff and Class Members to encrypt and/or more

reliably encrypt Plaintiff's and Class Members' PII and monitor user behavior and activity in order to identify possible threats.

72. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and the foreseeable consequences that would occur if Defendant Zeroed-In's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

73. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Zeroed-In's network, amounting to, at least, tens of thousands of individuals' PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

***Value of PII***

74. The PII of individuals remains of high value to criminals, as evidenced by the prices criminals will pay through the Dark Web. Numerous sources cite Dark Web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to

$200, and bank details have a price range of $50 to $200.[17] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[18] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[19]

---

[17] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Dec. 5, 2023).
[18] Brian Stack, Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Dec. 5, 2023).
[19] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-

75. An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[20]

76. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[21]

77. Conversely sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[22]

78. As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

79. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[23]

80. Based on the foregoing, the information compromised in the Data Breach, including full names matched with Social Security numbers, is significantly more valuable than

browsing/in-the-dark/ (last visited Dec. 5, 2023).

[20] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Dec. 5, 2023).

[21] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at: https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Dec. 5, 2023).

[22] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Dec. 5, 2023).

[23] https://datacoup.com (last visited Dec. 3, 2023).

the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

81. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[24]

82. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

83. The fraudulent activity resulting from the Data Breach may not come to light for years as there may be a time lag between when harm occurs versus when it is discovered, and also between when the PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[25]

84. At all relevant times, Defendants knew, or reasonably should have known, of the

[24] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Dec. 5, 2023).

[25] *Report to Congressional Requesters*, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf (last visited Dec. 5, 2023).

importance of safeguarding the PII of Plaintiff and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if Defendant Zeroed-In's security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

85. Plaintiff and Class Members now face a lifetime of constant surveillance of their financial and personal records, credit monitoring, and loss of rights. Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

86. Defendants have acknowledged the risk and harm caused to Plaintiff and Class Members as a result of the Data Breach. Defendants, to date, has offered Plaintiff and Class Members abbreviated, non-automatic credit monitoring services. The limited credit monitoring is inadequate to protect Plaintiff and Class Members from the threats they face for years to come, particularly in light of the PII at issue here. Moreover, Defendants put the burden squarely on Plaintiff and Class Members to enroll in the inadequate monitoring services.

***Defendants Failed to Properly Protect Plaintiff's and Class Members' PII***

87. Defendants could have prevented this Data Breach by properly securing and encrypting the systems containing the PII of Plaintiff and Class Members. Alternatively, Defendants could have destroyed the data, especially for individuals with whom it had not had a relationship for a period of time.

88. Defendants' negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to companies like Defendants to protect and secure sensitive data they possess.

89. Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the PII of Plaintiff and Class

Members from being compromised.

90. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[26]

91. The ramifications of Defendants' failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for their respective lifetimes.

92. To prevent and detect unauthorized cyber-attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider

[26] *See generally Fighting Identity Theft With the Red Flags Rule: A How-To Guide for Business*, FED. TRADE COMM., https://www.ftc.gov/business-guidance/resources/fighting-identity-theft-red-flags-rule-how-guide-business (last visited Dec. 5, 2023).

using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[27]

93. To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating

[27] *Id.* at 3-4.

systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

• **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[28]

94. To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

[28] *See* Security Tip (ST19-001) *Protecting Against Ransomware* (original release date Apr. 11, 2019), available at https://www.cisa.gov/news-events/news/protecting-against-ransomware (last visited Dec. 5, 2023).

- Apply latest security updates;
- Use threat and vulnerability management;
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities;
- Hunt for brute force attempts;
- Monitor for cleanup of Event Logs;
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall;
- Enable tamper protection;
- Enable cloud-delivered protection;
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[29]

95. Moreover, given that Defendants were storing the PII of Plaintiff and Class Members, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

---

[29] *See Human-operated ransomware attacks: A preventable disaster*, Microsoft (Mar. 5, 2020). https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Dec. 6, 2023).

96. The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of Plaintiff and Class Members.

97. As a result of computer systems in need of security upgrades, inadequate procedures for handling email phishing attacks, viruses, malignant computer code, hacking attacks, Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII.

98. Because Defendants failed to properly protect and safeguard Plaintiff's and Class Members' PII, an unauthorized third party was able to access Zeroed-In's network, access its database and system configuration files, and exfiltrate that data.

***Defendants Failed to Comply with Industry Standards***

99. As noted above, experts studying cyber security routinely identify entities in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

100. Several best practices have been identified that, at a minimum, should be implemented by companies in possession of PII like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which customers can access sensitive data. Defendants failed to follow these industry best practices, including a failure to implement multi-factor authentication.

101. Other best cybersecurity practices that are standard in industries that collect and maintain large amounts of PII, include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management

systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

102. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

103. These foregoing frameworks are existing and applicable industry standards for companies in possession of PII, and upon information and belief, Defendants failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

104. Upon information and belief, Defendants failed to comply with one or more of the foregoing industry standards.

***Defendants' Negligent Acts and Breaches***

105. Defendants participated in and controlled the process of gathering the PII from Plaintiff and Class Members.

106. Defendants therefore assumed and otherwise owed duties and obligations to Plaintiff and Class Members to take reasonable measures to protect the information, including the duty of oversight, training, instruction, testing of the data security policies and network systems. Defendants breached these obligations to Plaintiff and Class Members and/or was otherwise negligent because it failed to properly implement data security systems and policies for its network

that would adequately safeguard Plaintiff's and Class Members' PII. Upon information and belief, Defendants' unlawful conduct included, but is not limited to, one or more of the following acts and/or omissions:

a. Failing to design and maintain an adequate data security system to reduce the risk of data breaches and protect Plaintiff's and Class Members' PII;

b. Failing to properly monitor its data security systems for data security vulnerabilities and risk;

c. Failing to test and assess the adequacy of its data security system;

d. Failing to develop adequate training programs related to the proper handling of emails and email security practices;

e. Failing to develop and put into place uniform procedures and data security protections for its network;

f. Failing to adequately fund and allocate resources for the adequate design, operation, maintenance, and updating necessary to meet industry standards for data security protection;

g. Failing to ensure or otherwise require that it was compliant with FTC guidelines for cybersecurity;

h. Failing to ensure or otherwise require that it was adhering to one or more of industry standards for cybersecurity discussed above;

i. Failing to implement or update antivirus and malware protection software in need of security updating;

j. Failing to require encryption or adequate encryption on its data systems;

k. Otherwise negligently and unlawfully failing to safeguard Plaintiff's and Class

Members' PII provided to Defendants, which in turn allowed cyberthieves to access its IT systems.

## COMMON INJURIES & DAMAGES

107. As result of Defendants' ineffective and inadequate data security practices, Plaintiff and Class Members now face a present and ongoing risk of fraud and identity theft.

108. Due to the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution or loss of value of their PII; and (i) the continued risk to their PII, which remains in Defendants' possession, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

### *The Risk of Identity Theft to Plaintiff and Class Members Is Present and Ongoing*

109. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

110. Because a person's identity is akin to a puzzle with multiple data points, the more

accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

111. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

112. The Dark Web is an unindexed layer of the internet that requires special software or authentication to access.[30] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, Dark Web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[31] This prevents Dark Web marketplaces from being easily monitored by authorities or accessed by those not in the know.

113. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the PII at issue here.[32] The digital character of PII stolen in data breaches lends itself to dark web transactions

[30] Louis DeNicola, *What Is the Dark Web?*, Experian (May 12, 2021), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Dec. 6, 2023).
[31] *Id*.
[32] *What is the Dark Web?* – Microsoft 365 (July 15, 2022), https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited Dec. 5, 2023).

because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[33] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[34]

114. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[35]
>
> What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

115. Even then, a new Social Security number may not be effective, as "[t]he credit

---

[33] *Id.*; *see also* Louis DeNicola, *supra* note 30.
[34] *Id.*
[35] Social Security Administration, *Identity Theft and Your Social Security Number* (2021), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Dec. 5, 2023).

bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[36]

116. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[37]

117. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[38]

118. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[39] Defendants did not rapidly report to Plaintiff and Class Members that their PII had been stolen.

119. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently

[36] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Dec. 5, 2023).
[37] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Dec. 5, 2023).
[38] *See 2019 Internet Crime Report*, FBI (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited Dec. 5, 2023).
[39] *Id*.

opened accounts or misuse of existing accounts.

120. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

121. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and Class Members will need to remain vigilant against unauthorized data use for years or even decades to come.

122. The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[40]

123. The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4)

[40] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), FTC (Dec. 7, 2009), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited Dec. 5, 2023).

limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[41]

124. According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money, and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.[42]

125. Defendants' failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Loss of Time to Mitigate the Risk of Identify Theft and Fraud***

126. As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

---

[41] *See generally* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Dec. 5, 2023).

[42] *See, e.g.*, FTC, *Commission Finds LabMD Liable for Unfair Data Security Practices*, available at: https://www.ftc.gov/news-events/news/press-releases/2016/07/commission-finds-labmd-liable-unfair-data-security-practices (last visited Dec. 5, 2023).

127. Thus, due to Defendants' admitted recognition of the actual and imminent risk of identity theft, Defendants offered Plaintiff and Class Members abbreviated, non-automatic credit monitoring services.

128. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

129. Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[43]

130. Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[44]

131. A study by Identity Theft Resource Center shows the multitude of harms caused by

---

[43] *See* U.S. GOV'T ACCOUNTABILITY OFF., GAO-07-737, PERSONAL INFORMATION: DATA BREACHES ARE FREQUENT, BUT EVIDENCE OF RESULTING IDENTITY THEFT IS LIMITED; HOWEVER, THE FULL EXTENT IS UNKNOWN (2007) ("GAO Report"), available at: https://www.gao.gov/new.items/d07737.pdf (last visited Dec. 5, 2023).

[44] *See* Federal Trade Commission, IdentityTheft.gov, https://www.identitytheft.gov/Steps (last visited Dec. 5, 2023).

fraudulent use of personal and financial information:[45]




132. Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[46]

***Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

[45] "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at: https://web.archive.org/web/20190304002224/https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited Dec. 5, 2023).

[46] *See* Federal Trade Commission, IdentityTheft.gov, https://www.identitytheft.gov/Steps (last visited Dec. 5, 2023).

133. To date, Defendants have done little to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach.

134. The abbreviated, non-automatic credit monitoring offered to persons whose PII was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face ongoing identity theft and financial fraud for the remainder of their lives. Defendants also place the burden squarely on Plaintiff and Class Members by requiring them to independently sign up for that service, as opposed to automatically enrolling all victims of this Data Breach.

135. Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/Dark Web for sale and purchase by criminals intending to utilize the PII for identity theft crimes – e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

136. It must be noted there may be a substantial time lag – measured in years – between when harm occurs versus when it is discovered, and also between when PII and/or financial information is stolen and when it is used.

137. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

138. Furthermore, the information accessed and disseminated in the Data Breach is

significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[47] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

139. Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

140. The retail cost of credit monitoring and identity theft monitoring can cost around

$200 a year, or more, per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their PII.

***Injunctive Relief Is Necessary to Protect against Future Data Breaches***

141. Moreover, Plaintiff and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing PII is not accessible online and that access to such data is password protected.

***Plaintiff Jack Meyers' Experience***

142. Plaintiff Jack Meyers worked for Dollar Tree from 1998 to 2004 as an Assistant General Manager. At the time of the Data Breach, Defendants retained Plaintiff Jack Meyers' PII

[47] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last visited Dec. 5, 2023).

in their systems.

143. Plaintiff Meyers was sent a Notice Letter dated November 27, 2023, informing him that Defendants had experienced a Data Breach and that his PII, including his full name, date of birth, and Social Security number, was compromised in the breach.

144. As a result of the Data Breach, Plaintiff Meyers spent time dealing with the consequences of the Data Breach, which includes verifying the legitimacy of the Notice Letter, and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Defendant Zeroed-In's direction by way of the Notice Letter where Defendant advised Plaintiff Meyers to mitigate his damages by, among other things, freezing his credit accounts and monitoring his accounts for fraudulent activity.

145. Plaintiff Meyers is a cautious person and is therefore very careful about sharing his sensitive PII. As a result, he has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Meyers stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, Plaintiff Meyers diligently chooses unique usernames and passwords for his various online accounts, changing and refreshing them as needed to ensure his information is as protected as it can be.

146. Plaintiff Meyers only allowed Defendants to maintain, store, and use his PII because he believed that Defendants would use basic security measures to protect his PII, such as requiring passwords and multi-factor authentication to access databases storing his PII. As a result, Plaintiff's PII was within the possession and control of Defendants at the time of the Data Breach.

147. In the instant that his PII was accessed and obtained by a third party without his

consent or authorization, Plaintiff suffered injury from a loss of privacy.

148. Plaintiff Meyers has been further injured by the damages to and diminution in value of his PII—a form of intangible property that Plaintiff entrusted to Defendants. This information has inherent value that Plaintiff was deprived of when his PII was placed on a publicly accessible database, exfiltrated by cybercriminals, and, upon information and belief, later placed for sale on the dark web.

149. Furthermore, Plaintiff Meyers has experienced an increase in the number of spam emails, spam text messages, spam phone calls, and phishing attempts, which has required that he expend additional time and energy combatting these new forms of spam, and defending himself against phishing attempts.

150. The Data Breach has caused Plaintiff Meyers to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse resulting from his PII being placed in the hands of criminals.

151. The loss of privacy and substantial present risk of additional imminent harm have caused Plaintiff Meyers to suffer stress, fear, and anxiety as Plaintiff Meyers is very concerned that his sensitive PII is now in the hands of data thieves and shall remain that way for the remainder of his lifetime and there is nothing Plaintiff Meyers can do to retrieve his stolen PII from the cyber-criminals.

152. Plaintiff Meyers is aware of no other source from which the theft of his PII could have come. He regularly takes steps to safeguard his own PII in his own control.

153. Given the time Plaintiff Meyers has lost investigating this Data Breach, taking steps to understand its full scope, determining the appropriate remedial steps, contacting counsel, etc., coupled with Plaintiff Meyers' resultant and naturally foreseeable fears/concerns for the use

of Plaintiff Meyers' valuable PII, the damages articulated more specifically above are far from the full extent of the harm thereto.

154. Plaintiff Meyers has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected, and safeguarded from future breaches.

## CLASS ALLEGATIONS

155. Plaintiff brings this class action on behalf of themselves and on behalf of others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

156. The Class that Plaintiff seeks to represent is defined as follows:

> **All individuals whose PII was compromised in the data breach that is the subject of the Notice of Security Incident that Zeroed-In Technologies, LLC sent to Plaintiff and Class Members on or around November 27, 2023 (the "Class").**

157. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

158. Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

159. Numerosity, Fed R. Civ. P. 23(a)(1): Class Members are so numerous that joinder

of all members is impracticable. Upon information and belief, there are at least multiple thousands of individuals who were notified by Defendant Zeroed-In of the Data Breach. According to the report submitted to the Maine Attorney General's office, 1,977,486 individuals had their PII compromised in this Data Breach.[48] The identities of Class Members are ascertainable through Defendants' records, Class Members' records, publication notice, self-identification, and other means.

160. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendants had a duty to protect the PII of Plaintiff and Class Members;

b. Whether Defendants had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendants had duties not to use the PII of Plaintiff and Class Members for non-business purposes;

d. Whether Defendants failed to adequately safeguard the PII of Plaintiff and Class Members;

e. Whether and when Defendants actually learned of the Data Breach;

f. Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g. Whether Defendants violated the law by failing to promptly notify Plaintiff and

[48] *See* Data Breach Notifications, Office of the Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/b3993ddd-2443-4645-ae45-f36dc7686236.shtml (last visited Dec. 5, 2023).

Class Members that their PII had been compromised;

h. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members;

k. Whether Defendants violated the consumer protection statutes invoked herein;

l. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

m. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendants' wrongful conduct; and

n. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

161. Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendants' misfeasance.

162. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class

Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

163. Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

164. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

165. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm

the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

166. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

167. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

168. Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the PII of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

169. Further, Defendants have acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

170. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues

include, but are not limited to:

a. Whether Defendants owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

b. Whether Defendants breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

c. Whether Defendants failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether an implied contract existed between Defendants on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

e. Whether Defendants breached the implied contract;

f. Whether Defendants adequately and accurately informed Plaintiff and Class Members that their PII had been compromised;

g. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members;

i. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class Against Defendant Zeroed-In)

171. Plaintiff re-alleges and incorporate by reference herein all of the allegations

contained in paragraphs 1 through 170.

172. This claim is brought by Plaintiff individually and on behalf of the Class against Defendant Zeroed-In.

173. Defendant Zeroed-In owed a duty to Plaintiff and Class Members to exercise reasonable care in safeguarding, securing, and protecting the PII in their possession, custody, or control.

174. By collecting and storing this data in its computer system and network, Defendant Zeroed-In owed a duty of care to use reasonable means to prevent disclosure of patient PII, and to safeguard the information from theft. Defendant Zeroed-In's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

175. Defendant Zeroed-In knew or should have known the risks of collecting and storing Plaintiff's and all other Class Members' PII and the importance of maintaining secure systems. Defendants knew or should have known of the many data breaches that have targeted companies that stored PII in recent years.

176. Given the nature of Zeroed-In's business, the sensitivity and value of the PII it maintains, and the resources at its disposal, it should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

177. On their websites, Zeroed-In explicitly promises to follow industry standards and use reasonable methods to protect the PII in its control.

178. Zeroed-In breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security

processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiff's and Class Members' PII.

179. Plaintiff and Class Members had no ability to protect their PII that was, or remains, in Defendant Zeroed-In's possession.

180. It was or should have been reasonably foreseeable to Defendant Zeroed-In that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' PII to unauthorized individuals.

181. But for Defendant Zeroed-In's negligent conduct or breach of the above-described duties owed to Plaintiff and Class Members, their PII would not have been compromised. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Zeroed-In's failure to exercise reasonable care in safeguarding, securing, and protecting such PII by, *inter alia*, adopting, implementing, and maintaining appropriate security measures.

182. As a result of Defendant Zeroed-In's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that

will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; (vii) overpayment for the services that were received without adequate data security; (viii) loss of privacy from the unauthorized access and exfiltration of PII; and (ix) diminished value of PII.

## COUNT II
## NEGLIGENCE
## (On Behalf of Plaintiff and the Class Against Defendants Dollar Tree and Family Dollar)

183. Plaintiff re-alleges and incorporate by reference herein all of the allegations contained in paragraphs 1 through 170.

184. This claim is brought by Plaintiff individually and on behalf of the Class against Defendants Dollar Tree and Family Dollar.

185. Dollar Tree and Family Dollar owed a duty to Plaintiff and Class Members to exercise reasonable care in safeguarding, securing, and protecting the PII in their possession, custody, or control, to include safeguarding the PII it shared with others in the course of its business.

186. Dollar Tree and Family Dollar knew or should have known the risks of collecting and storing Plaintiff's and all other Class Members' PII and the importance of ensuring it was being housed on secure systems. Dollar Tree and Family Dollar knew or should have known of the many data breaches that have targeted companies that stored PII in recent years.

187. Given the nature of Dollar Tree and Family Dollar's business, the sensitivity and value of the PII they collect, and the resources at their disposal, Dollar Tree and Family Dollar should have fully vetted and tested any companies it shared employee and customer information with, including Zeroed-In. However, regardless of Dollar Tree and Family Dollar's own negligence, it is also liable for the negligence of Defendant Zeroed-In, which were acting as Dollar

Tree and Family Dollar's agent at the time of the Data Breach.

188. On their websites, Dollar Tree and Family Dollar explicitly promise to follow industry standards and use reasonable methods to protect the PII in their control.

189. Dollar Tree and Family Dollar breached these duties by failing to exercise reasonable care in safeguarding and protecting Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to them—including Plaintiff's and Class Members' PII.

190. Plaintiff and Class Members had no ability to protect their PII that was, or remains, in Dollar Tree and Family Dollar's possession.

191. It was or should have been reasonably foreseeable to Dollar Tree and Family Dollar that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' PII to unauthorized individuals.

192. But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class Members, their PII would not have been compromised. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Dollar Tree and Family Dollar's failure to exercise reasonable care in safeguarding, securing, and protecting such PII by, *inter alia*, adopting, implementing, and maintaining appropriate security measures.

193. As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class Members

have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; (vii) overpayment for the services that were received without adequate data security; (viii) loss of privacy from the unauthorized access and exfiltration of PII; and (ix) diminished value of PII.

## COUNT III
## BREACH OF IMPLIED CONTRACT
## (On behalf of Plaintiff and the Class Against Defendant Zeroed-In)

194. Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 170.

195. This claim is brought by Plaintiff individually and on behalf of the Class against Defendant Zeroed-In.

196. The PII of Plaintiff and Class Members, including full names, dates of birth, and Social Security numbers, was provided and entrusted to Defendant.

197. Plaintiff and Class Members provided their PII to Defendant Zeroed-In, either directly or indirectly, through Defendants Dollar Tree and Family Dollar, as part of Defendant Zeroed-In's regular business practices.

198. Plaintiff and the Class entrusted their PII to Defendant Zeroed-In. In doing so, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and

to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen. As a condition of obtaining services and being employed by Defendant Zeroed-In's clients, Plaintiff and Class Members provided and entrusted their PII. In so doing, Plaintiff and Class Members entered into implied contracts with Defendant Zeroed-In by which it agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and Class Members if their data had been breached and compromised or stolen.

199. A meeting of the minds occurred when Plaintiff and Class Members agreed to, and did, provide their PII to Defendant and/or Defendant's clients with the reasonable understanding that their PII would be adequately protected by any business associates, like Defendant Zeroed-In, from foreseeable threats. This inherent understanding exists independent of any other law or contractual obligation any time that highly sensitive PII is exchanged as a condition of receiving services. It is common sense that but for this implicit and/or explicit agreement, Plaintiff and Class Members would not have provided their PII.

200. Defendant separately has contractual obligations arising from and/or supported by the consumer facing statements in its Privacy Policy.

201. Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant Zeroed-In.

202. Defendant Zeroed-In breached the implied contracts it made with Plaintiff and Class Members by failing to safeguard and protect their PII and by failing to provide timely and accurate notice that PII was compromised as a result of the Data Breach.

203. As a direct and proximate result of Defendant Zeroed-In's above-described breach of implied contract, Plaintiff and Class Members have suffered (and will continue to suffer)

ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

204. As a result of Defendant Zeroed-In's breach of implied contract, Plaintiff and Class Members are entitled to and demand actual, consequential, and nominal damages.

## COUNT IV
## Unjust Enrichment
## (On behalf of Plaintiff and the Class Against Defendant Zeroed-In)

205. Plaintiff re-alleges and incorporate by reference herein all of the allegations contained in paragraphs 1 through 170. Notwithstanding, Plaintiff brings this claim in the alternative to any claim for breach of contractual obligations.

206. This claim is brought by Plaintiff individually and on behalf of the Class against Defendant Zeroed-In.

207. Defendant Zeroed-In benefited from receiving Plaintiff's and Class Members' PII by its ability to retain and use that information for its own benefit. Defendant Zeroed-In understood this benefit.

208. Defendant Zeroed-In enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

209. Defendant Zeroed-In was also enriched from the value of Plaintiff's and Class Members' PII. PII has independent value as a form of intangible property. Defendant also derived

value from this information because it allows Defendant Zeroed-In to operate its business and generate revenue.

210. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant Zeroed-In instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant Zeroed-In's failure to provide the requisite security.

211. Under the principles of equity and good conscience, Defendant Zeroed-In should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members, because Defendant Zeroed-In failed to implement appropriate data management and security measures that are mandated by industry standards.

212. Defendant Zeroed-In acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

213. If Plaintiff and Class Members knew that Defendant Zeroed-In had not secured their PII, they would not have agreed to provide their PII to Defendant Zeroed-In.

214. Plaintiff and Class Members have no adequate remedy at law.

215. As a direct and proximate result of Defendant Zeroed-In's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent

researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remains in Defendant Zeroed-In's possession and is subject to further unauthorized disclosures so long as Defendant Zeroed-In fails to undertake appropriate and adequate measures to protect the PII in their continued possession and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

216. As a direct and proximate result of Defendant Zeroed-In's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

217. Defendant Zeroed-In should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them.

**COUNT V**
**Unjust Enrichment**
**(On behalf of Plaintiff and the Class Against Defendants Dollar Tree and Family Dollar)**

218. Plaintiff re-alleges and incorporate by reference herein all of the allegations contained in paragraphs 1 through 170.

219. This claim is brought by Plaintiff individually and on behalf of the Class against Defendants Dollar Tree and Family Dollar.

220. Defendants Dollar Tree and Family Dollar benefited from receiving Plaintiff's and Class Members' PII by their ability to retain and use that information for its own benefit. Defendants Dollar Tree and Family Dollar understood this benefit.

221. Defendants Dollar Tree and Family Dollar enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and

Class Members' PII.

222. Defendants Dollar Tree and Family Dollar were also enriched from the value of Plaintiff's and Class Members' PII. PII has independent value as a form of intangible property. Defendants Dollar Tree and Family Dollar also derived value from this information because it allows Defendants Dollar Tree and Family Dollar to operate its business and generate revenue.

223. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants Dollar Tree and Family Dollar instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants Dollar Tree and Family Dollar's failure to provide the requisite security.

224. Under the principles of equity and good conscience, Defendants Dollar Tree and Family Dollar should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members, because Defendants Dollar Tree and Family Dollar failed to implement appropriate data management and security measures that are mandated by industry standards.

225. Defendants Dollar Tree and Family Dollar acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

226. If Plaintiff and Class Members knew that Defendants Dollar Tree and Family Dollar had not secured their PII, they would not have agreed to provide their PII to Defendant.

227. Plaintiff and Class Members have no adequate remedy at law.

228. As a direct and proximate result of Defendants Dollar Tree's and Family Dollar's

conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft;

(vi) the continued risk to their PII, which remains in Defendants Dollar Tree and Family Dollar's possession and is subject to further unauthorized disclosures so long as Defendants Dollar Tree and Family Dollar fail to undertake appropriate and adequate measures to protect the PII in their continued possession and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

229. As a direct and proximate result of Defendants Dollar Tree's and Family Dollar's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

230. Defendants Dollar Tree and Family Dollar should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendants and that the Court grant the following:

A. For an Order certifying the Classes, and appointing Plaintiff and his counsel to

represent the Class;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendants to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii. requiring Defendants to delete, destroy, and purge the PII of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v. prohibiting Defendants from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi. requiring Defendants to engage independent third-party security auditors/

penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendants to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

x. requiring Defendants to conduct regular database scanning and securing checks;

xi. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiff and Class Members;

xii. requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendants to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding

subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xiv. requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including, but not limited to, actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Respectfully submitted,

DATED: December 7, 2023

*/s/ Thomas A. Pacheco*

THOMAS A. PACHECO (Bar No. 1712140091)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, LLC**
900 W Morgan Street
Raleigh, NC 27603
T: (212) 946-9305
tpacheco@milberg.com

RACHELE R. BYRD*
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Tel: (619) 239-4599
byrd@whafh.com

M. ANDERSON BERRY*
GREGORY HAROUTUNIAN*
CLAYEO C. ARNOLD
**A PROFESSIONAL CORPORATION**
6200 Canoga Avenue, Suite 375
Woodland Hills, CA 91367
Tel: (747) 777-7748
Fax: (916) 924-1829
aberry@justice4you.com
gharoutunian@justice4you.com

**Pro Hac Vice Forthcoming*

*Attorneys for Plaintiff and the Proposed Class*

30220v2